## WEST BRANCH NOVELTY CO. v. BLOOM.
### No. 37.

District Court, E. D. Pennsylvania.
Feb. 9, 1940.

David P. Wolhaupter and Emory L. Groff, both of Washington, D. C., and Elton J. Buckley, of Philadelphia, Pa., for appellant.

Harry Langsam, of Philadelphia, Pa., for defendant.

KALODNER, District Judge.

This is a patent infringement suit wherein plaintiff seeks an injunction, damages and an accounting. The case was tried before me without a jury upon depositions, pleadings and exhibits only.

The patent involved is No. 1,998,599 to Weber, assigned to plaintiff, and is for a combination cedar chest and hinge. It was issued on the 23d day of April, 1935. The structure of the accused product of the defendant is made under and in accordance with a later patent issued to Bloom on the 12th day of January, 1937, No. 2,067,559.

The defense is threefold:

(a) Non-infringement:

(b) Invalidity of the plaintiff's patent because of anticipation by prior patents:

(c) The grant to the defendant of the later patent in accordance with which the defendant's structure or hinge device is made.

If the plaintiff's patent is invalid, its suit must fail. I address myself, therefore, in limine, to the consideration and determination of the validity of the patent to Weber.

According to the claims, the plaintiff's patent is for "The combination with a cedar chest and a lid therefor, of means located entirely outside of the chest and protected thereby from fumes in the chest, for hingedly connecting the lid to the chest and for limiting its swinging movement. * * *"

The cedar chest itself consists of an ordinary rectangular cedarwood box with a separate rectangular lid, the latter rimmed (according to the exhibits) about the edges. The hinge consists essentially of two metal plates: One attached by screws to the outside of the side wall of the chest near the top and back portions thereof, and the other plate attached by similar screws to the underside of the lid. This lid-plate is countersunk into the wood of the lid, so that the visible portion of the plate is flush with the

undersurface of the lid. Also, this lid plate bears, integrally connected with it, a wing bent at right angles to the plate: The wing is of such size and shape, and extends in such direction, that it permits a bolt to be drawn through a hole in the wing and through another hole (corresponding in position and space to that in the wing) in a protruding portion of the plate attached to the wall of the chest. Thus (by the operation of two hinges, one on each side of the chest) the wing, and with it the lid to which the lid plates are attached, rotates on these bolts as on pivots, permitting the opening and the closing of the lid, or, to put it otherwise, permitting the movement of the lid through a circular arc, upon an axis which is a line drawn through the two bolts in the two hinges.

Furthermore, the wing itself has a small protuberance (a portion of one end protrudes in an "ear") which engages a corresponding protuberance on the lid attached to the wall of the chest (bent outward at right angles). At a certain point in the rotation of the wing with the opening of the lid, the two protuberances catch, come into contact with each other, and further progress of the wing, and of the lid, is stopped. Thus the swinging movement of the lid is limited. The two ears are so arranged in space that the movement of the opening lid is stopped by their contact when the lid is in approximately an upright position (i.e., when it has swung through ninety degrees of arc) or a little beyond. In that position the lid is prevented by gravity from falling forward and closing the box, and prevented by the juxtaposition or engaging of the two ears from falling backward.

It has already been said that the hinge plate attached to the lid is countersunk. Further, this plate is attached to the lid *outside* the vertical plane of the inner side of the chest wall. Thus when the lid is closed, this plate lies between the lower surface of the lid and upper surface of the side wall of the chest, and fumes from the chest do not, theoretically, come into contact with the metal of which the plate is formed. This is a desideratum, since the wood of which cedar chests are made gives off vapors which deposit on metal as a gummy substance, to the possible detriment of the clothing whose storage is the function of the chest.

I have striven to employ non-technical language, and to be brief, in the description of the chest and hinges. For a detailed description, the patent itself and the drawings must be referred to. For that purpose, they are set forth directly hereinbelow.[1]

---

[1] United States Patent Office
1,998,599

Lid Mounting for Cedar Chests

John Weber, Milton, Pa., assignor to West Branch Novelty Company, Milton, Pa.

Application February 21, 1934, Serial No. 712,408

2 Claims. (Cl. 217—57)

This invention relates to a mounting for the lid of a cedar chest and has reference more particularly to the location of the hinges upon the body of the chest and to the particular construction of the hinges used.

As is well known to those skilled in the art any metal located inside a cedar chest will soon become coated with a gummy substance carried by the fumes of cedar. As cedar chests are used primarily as storage places for fine garments, the accumulation of this gummy substance on metal within the chests has been very objectionable because it frequently has come into contact with the garments from which it is difficult to remove. It has been the practice to mount the lids of cedar chests upon metal hinges requiring braces for supporting the lid in raised position and either the hinges or the braces or both have been located within the chest when closed where they can collect the objectionable deposits referred to and where they are likely to damage the stored garments through contact with them.

It is an object of the present invention to provide a mounting for a cedar chest which will not only constitute the necessary hinge connection between the lid and the body of the chest but will also constitute a means for limiting the upward movement of the lid so that it can be supported without the use of the usual braces.

It is also an object of this invention to provide combination hinges and stops which can be located entirely outside of the body of the chest where they can not come into contact with the stored garments and where they will not become coated with the objectionable deposit emanating from the cedar wood.

With the foregoing and other objects in view which will appear as the description proceeds, the invention consists of certain novel details of construction and combinations of parts hereinafter more fully described and pointed out in the claims, it being understood that changes

April 23, 1935.   J. Weber   1,998,599

Lid Mounting for Cedar Chests

Filed Feb. 21, 1934

*Fig.1.*

*Fig. 2.*

*Fig.3*

*John Weber* Inventor

By *C. A. Snow & Co.* Attorneys

The hinge of the type shown in Figures 2 and 3 in the above drawings is not involved in this suit.

A structure made in accordance with the description in Weber's patent will therefore consist of a box with a lid: the two connected together by means of metal hinges: the parts of which the hinges are formed being either outside the chest (where fumes from the inside cannot attack them) or, when inside the chest, countersunk into the lid in such a place as to be between the lid and the top of the side wall of the chest when the lid is closed—so that, again, the said metal parts are theoretically immune from contact with vapor emanating from inside the chest. The different parts of the hinges are so constructed as to pivot upon each other, so that the lid may open and close, and are further so constructed as to limit the opening of the lid to a predetermined degree by means of the protuberances or ears, which I have already described.

The salient features of the structure delineated by the patent are (a) the pivotal connections between the parts of the hinges permitting the opening and closing of the lid, (b) the device for limiting the opening of the lid to a predetermined degree, (c) the shielding of the metal from which the hinge is constructed, from fumes given off inside the chest.

The questions presented are:

(a) Whether the elements of the Weber patent are old because anticipated;

may be made in the construction and arrangement of parts without departing from the spirit of the invention as claimed.

In the accompanying drawing the preferred forms of the invention have been shown.

In said drawing

Figure 1 is a perspective view of a portion of a cedar chest and its lid, the lid being shown raised and its mounting consisting of two hinges of novel construction being shown in one extreme position outside of the body of the chest.

Figure 2 is a side elevation of a modified form of hinge designed primarily for use in connection with chests the lids of which do not extend to the back of the body of the chest, portions of the chest and lid being illustrated partly in section and partly in elevation.

Figure 3 is a section on line 3—3, Figure 2.

Referring to the figures by characters of reference I designates a portion of the body of a cedar chest which can be of any desired construction and is adapted to be closed by a lid 2 which will rest on the top of the body when closed.

For the purpose of connecting the lid to the body and at the same time limiting the upward movement of the lid, hinges of novel construction are employed. Where the lid is connected to the back of the body the hinges shown in Figure 1 are employed. Each hinge includes a stationary attaching plate 3 secured to the outer surface of one side wall of body I by means of screws 4 or other fastening devices and an ear 5 can be extended laterally from one end of the plate for the purpose of lapping and bearing against the back wall of the body to which it can be fastened by screws or the like. This attaching plate is cut away along its top adjacent the forward end as shown at 6 and where the plate is extended back of and above the cut away portion it is bent laterally and outwardly to form a stop ear 7.

Lapping the outer side of the plate 3 is a segmental wing 8 joined to the upper back corner portion of the plate 3 by a pivot device 9. This segmental plate extends through approximately 90° and is provided at one end of its arcuate edge with a projecting ear 10 adapted to come against the ear 7 when the lid 2 is open-

(b) Whether the plaintiff's device, even though the elements be old, amounts nevertheless to such a combination of old elements as to be patentable.

That the elements are old, there can be no doubt.

In the plaintiff's reply brief, it is stated (p. 5): "In the case of combination

---

ed as hereinafter explained. At the other end of the arcuate edge of the segmental plate 8 there is provided a laterally extending attaching plate 11 integral with plate 8 and extending along one straight edge thereof. The attaching plate is adapted to be secured to lid 2 by screws 12 or the like and is preferably of such a width as to be covered by the adjacent walls of the body 1 when the lid is closed.

Attention is called to the fact that both hinges are located entirely outside of the body 1. Thus when the lid is closed there is no metal either on the lid or on the body which can contact with the stored fabrics. Nor is there any metal located where it can accumulate the gummy deposit emanating within the chest from the cedar wood. When the lid is raised it will swing about the axis of the alined pivots 9 and when it is brought to its uppermost position the ear 10 will come against the plate 11 so that further movement of the lid will be prevented and the lid will be properly supported by gravity without requiring the use of braces or other types of stops commonly employed.

The type of hinge heretofore described is designed for use where the lid is mounted at the back of the chest. Should there be a stationary top strip 13 on the back portion of the chest it would be necessary to provide hinges somewhat different from those already described in order to support the lid for swinging movement above the chest adjacent to the front edge of said back strip. A hinge used under these conditions has been illustrated in Figures 2 and 3. It includes a stationary attaching plate 14 secured to the outer side of the side wall of chest 15 and projecting upwardly above said wall and within and slightly above the strip 13. A movable wing 16 is pivotally connected at 17 to the upper end portion of plate 14 and is joined by a laterally extending attaching plate 18 to the bottom of the lid 19. A stop ear 20 is extended laterally from wing 16 and is adapted to work within an arcuate slot 21 in plate 14, said slot being concentric with the pivot 17. Thus when the lid 19 is closed onto the walls of chest 15 it will swing about the pivot 17 and stop ear 20 will travel in slot 21 until the lid is brought into position close to and in front of strip 13. When the lid is raised to a position slightly past dead center the ear 20 will come against one end wall of slot 21 as shown in Figure 2, thereby

limiting the upward movement of the lid and holding it in raised position by gravity.

It will be noted that the hinge is located entirely outside of the chest. Thus it cannot accumulate the gummy substance given off by the cedar from within the chest and it will not be located where it can contact with the fabrics stored in the chest. Furthermore the working parts will not become gummed to such an extent as to interfere with the proper operation of the hinge.

What is claimed is:

1. The combination with a cedar chest and a lid therefor, of means located entirely outside of the chest and protected thereby from fumes in the chest, for hingedly connecting the lid to the chest and for limiting its swinging movement, said means including an attaching plate secured to the outer side of the chest, an attaching plate secured to the lid at such a point as to be completely housed between the lid and chest wall when the lid is closed, a wing carried by the attaching plate on the lid and extending outside of the chest into lapping relation with the other attaching plate, a pivotal connection between said lapping portions shielded from fumes in the chest by the lid and chest walls when the lid is closed, and cooperating means carried by the lapping portions for limiting the movement of the lid to open position.

2. The combination with a cedar chest and a lid therefor, of means located entirely outside of the chest and protected thereby from fumes in the chest, for hingedly connecting the lid to the chest and for limiting its swinging movement, said means including an attaching plate secured to the outer side of the chest, an attaching plate secured to the lid at such a point as to be completely housed between the lid and chest wall when the lid is closed, a wing carried by the attaching plate on the lid and extending outside of the chest into lapping relation with the other attaching plate, a pivotal connection between said lapping portions shielded from fumes in the chest by the lid and chest walls when the lid is closed, cooperating means carried by the lapping portions for limiting the movement of the lid to open position, said means including a laterally extended ear on the wing, and a stop element on the attaching plate of the chest extending into the path of the ear.

John Weber.

claims, no just and fair-minded person would take the position that the elements were not old."

Later on the brief states, on the same page, that concededly the Weber patent falls, not in the class of inventions never before thought of, but in the class of those which are devised by "borrowing from known or old devices to make a new article of manufacture. * * *"

The inventor, appearing as a witness for the plaintiff, testified under cross-examination as follows:

"By Mr. Langsam:

"XQ138. Mr. Weber, are you the first one to ever make a hinge which is comprised of two pivoted members and which has stop members integrally formed with each of the members to limit the distance in which the parts of the hinge can be swung with respect to each other? A. No." (Plaintiff's depositions of May 25, 1939, p. 32.)

Again, the plaintiff testified:

"XQ98. Mr. Weber, you did not invent the cedar chest, did you? A. I did not." (Plaintiff's depositions of May 25, 1939, p. 22.)

"XQ99. Did you or were you the first inventor of a hinge which could be attached to a cabinet wherein the lid for the cabinet could be swung from a pivot point and wherein the lid would be held in substantially an upright position? A. The answer is no." (Plaintiff's Depositions of May 25, 1939, p. 23.)

The original patentee therefore did not invent a cedar chest, nor was he the inventor of a hinge displaying two of the three salient features above mentioned—the pivoting of the members of the hinge and the stop device.

He also was not the inventor of a hinge so devised as to be attached entirely on the outside of a box-like container. See the Nichelson patent, No. 311,439, anno 1885; Patent No. 180,129 to Heiser, anno 1876, and No. 175,040 to Crane, anno 1876. As a matter of fact, the last two mentioned are both pivoted stop hinges located entirely on the outside of the box or trunk for which they were devised.

Moreover, Mr. Robertson, plaintiff's expert, testified as follows:

"XQ76. Is it old to hinge a cover to a box by means of a hinge, one leaf of which is secured to the box and the other to the lid, both parts of the hinge being on the outside of the box? A. That is old also." (Plaintiff's rebuttal depositions of June 21, 22, 1939, p. 50.)

The same witness testified (p. 49 of plaintiff's rebuttal depositions of May 21, 22, 1939) that it was old to put a stop hinge on the inside of a box which has a lid therefor.

Therefore, a cedar chest is not new; hinges are certainly not new; a hinge with pivoting members is not new; a stop hinge is not new; a pivoting stop hinge is not new; and neither a hinge located on the outside, nor on the inside, of a chest, box or trunk, is new. Weber's type of stop members is not new: see 23 and 31 in Figure 3 of No. 1,522,944 to Amsden, (1924), and the lips 18 and 19 in Figure 3 of Patent No. 1,423,513 to Brown, (1922), also shown in perspective in Figure 1.

Housing part of the hinge, per se, is not new. Hinges or parts thereof have been housed on doors for many years. Soss (Patent No. 880,697, anno 1908) shows separate parts of door hinges sunk into mortises formed in the frame or door "in the usual manner". Patent No. 1,960,642 to Loftin, 1933, shows that he cut recesses in the inner faces of the moulding strips at the sides of his lid for a cedar chest, into which recess guide plates were sunk (see claim 6 of the patent).

Resting part of a hinge upon the undersurface of a lid is old. Patent No. 1,159,738 to Heal (1915) shows a hinge connecting a box and a cover, consisting of but a single plate; the bottom part of which is attached to the outside of the box and the upper part of which consists of a flange and lip, the flange resting against the undersurface of the lid where it extends past the walls of the box. The hinge turned on a pivot at the bottom.

Mr. Robertson, plaintiff's expert, testified as follows, at pages 22, 23 of plaintiff's rebuttal testimony:

"Q18. From the standpoint of your long experience as a patent lawyer and as a Commissioner of Patents, what is your opinion as to the reason or the basis upon which the Patent Office Examiner allowed the patent in suit over the prior art which you have discussed, as well as the prior art discussed in the Patent Office file wrapper of the patent in suit? A. From the examination of the file wrapper and contents found in Plaintiff's Exhibit 2, it appears that the claims as first filed were rejected and that new claims were inserted, one

of which is the same as claim 1 of the patent. The applicant's attorney requested an allowance of the new claims, including claim 1 of course, arguing that the combination recited in claim 1 presented subject matter of such a novelty as to justify the grant of a patent. Part of the argument is found on page 21 of the aforesaid Plaintiff's Exhibit No. 2, from which the following is quoted: 'It is thought that the claims presented herewith present clearly the fact that all parts of the hinge are protected from the fumes of the chest by being located entirely outside of the chest or else shielded between the top edges of the chest and the lid when the lid is closed. Thus with the chest in its normal position, that is to say with its lid closed, the fumes from the cedar oil will not come in contact with the metal portions of the hinge and become an objectionable, sticky substance thereon, as has been the case where the metal has been exposed to these fumes.'

"The Examiner, recognizing the force of this argument and the novelty thereof, formally allowed the claims as shown in the next paper of Plaintiff's Exhibit No. 2, found on page 23 thereof."

■ Plaintiff's theory of the case, therefore—the theory, that is, upon which he relies to sustain the validity of the Weber patent—seems to be that his combination, in a new and useful way, shields metal parts of necessary hinges on cedar chests from cedar oil fumes. I say "in a new and useful way", because the problem is old, and had been solved previous to Weber; and unless Weber shows something "new and useful" in this particular art, he is not entitled, generally speaking, to a patent. The statute, R.S. Sec. 4886, U.S.Code Title 35, Sec. 31, 35 U.S.C.A. § 31, describes the inventions for which patents may issue as any new and useful art, machine * * * or any new and useful improvements thereof. * * *.

Evidently, then, the problem here narrows down to the question whether there is anything new and useful in Weber's combination.

Weber's only departure from the prior art cited in this case, if any departure there be at all, is in not having the entire hinge located outside the chest, but instead in having one of his hinge plates attached to the under surface of the lid at such a place that at least part of the hinge plate lies within the boundary lines defining the outer sides of the chest walls, and counter-sinking that plate into the under surface of the lid, so that when the latter is closed all that exposed surface part of the plate inside the outer boundary of the chest walls lies housed between the plane defining the under surface of the lid and the plane defining the upper surface of the side wall of the chest—those two planes theoretically physically coinciding in space when the lid is closed.

Assuming all this to be a departure, has Weber displayed invention therein?

It is, of course, not invention to shield metal parts of hinges, stops or pivots from fumes emanating from the interior of cedar chests; Loftin's patent, supra, taught that. The question is whether there is invention in the particular way Weber adopted to shield those metal parts from the fumes.

■ It is by this time a platitude to say that the word "invention" is not susceptible of precise and rigorous definition, in the classic sense of the term—i. e., that the definition of a word includes everything germane, and excludes everything foreign, thereto. The Supreme Court has said in McClain v. Ortmayer, 141 U.S. 419, 427, 12 S.Ct. 76, 78, 35 L.Ed. 800, 803: "The truth is, the word cannot be defined in such manner as to afford any substantial aid in determining whether a particular device involves an exercise of the inventive faculty or not. In a given case we may be able to say that there is present invention of a very high order. In another we can see that there is lacking that impalpable something which distinguishes invention from simple mechanical skill. Courts, adopting fixed principles as a guide, have by a process of exclusion determined that certain variations in old devices do or do not involve invention; but whether the variation relied upon in a particular case is anything more than ordinary mechanical skill is a question which cannot be answered by applying the test of any general definition."

It is stated in Walker on Patents, Deller's Edition, vol. 1, pages 119, 120: "In determining whether patentable invention is involved, it is proper to take into consideration the condition of the trade or art to which the patent is applied (citing cases). Other factors to be considered are those which show the character, condition, and progress of the art to which the invention relates (citing cases); and the extent to which previous inventions had satisfied this want."

The application of these tests, or the use of these criteria, do not lead me to entertain a favorable view of the alleged invention in the Weber patent. The "art to which the patent is applied" did not, prior to the issue of Weber's patent, suffer from the want of means to isolate metal parts of hinges from cedar chest fumes. Heiser's hinge, located entirely on the outside of a trunk, would not come into contact with the fumes. Loftin's devices (though not of themselves anticipating the Weber patent in its mechanical structure) specifically recognize the desirability of preventing the fumes from reaching the metal of the hinge or support, or of any device producing an interaction between the lid and the box, and accomplish the result.

As to "the nature of the want supplied"— as already indicated—Weber's patent does not seem to me to have supplied any want, and previous inventions (those mentioned) had already satisfied it.

Nor is there anything in the evidence to convince me that Weber's combination initiated, or was responsible for, or connected with, any substantial progress in the art to which it related.

In the final analysis, determination of invention is a matter of judgment— which is itself a word difficult to define, or prescribe by limits or boundaries. It can safely be said, however, that the judgment is a product of the reasoning faculties of the human mind, compounded of and con-ditioned by experience in human affairs and (in the case of a judicial officer) the requirements, exigencies and training of legal and judicial work. And the subjective or personal factor—personal in the sense that judgment to some extent varies with the individual—is not negligible. Thus it was said by Judge Hand, in Kirsch Mfg. Co. v. Gould Mersereau Co., Inc., 2 Cir., 6 F.2d 793, 794: "Objective tests may be of value vaguely to give us a sense of direction, but the final destination can be only loosely indicated. An invention is a new display of ingenuity beyond the compass of the routineer, and in the end that is all that can be said about it. Courts cannot avoid the duty of divining as best they can what the day to day capacity of the ordinary artisan will produce. This they attempt by looking at the history of the art, the occasion for the invention, its success, its independent repetition at about the same time, and the state of the underlying art, which was a condition upon its appearance at all.

Yet, when all is said, there will remain cases when we can only fall back upon such good sense as we may have, and in these we cannot help exposing the inventor to the hazard inherent in hypostatizing such modifications in the existing arts as are within the limited imagination of the journeyman. There comes a point when the question must be resolved by a subjective opinion as to what seems an easy step and what does not. We must try to correct our standard by such objective references as we can, but in the end the judgment will appear, and no doubt be, to a large extent personal, and in that sense arbitrary."

To what conclusion does this necessary exercise of the judgment lead? I cannot but adhere to the view, in the instant case, that all Weber did was to create a difficulty, and then overcome it by a simple device; a device which does not, in the words of Mr. Justice Matthews, seem to me to "spring from that intuitive faculty of the mind put forth in the search for new results or new methods, creating what had not before existed, or bringing to life what lay hidden from vision * * *." Hollister v. Benedict & Burnham Mfg. Co., 113 U.S. 59, 72, 5 S.Ct. 717, 724, 28 L.Ed. 901, 905.

Weber, apparently starting with the conception of a stop pivoting hinge located entirely outside the cedar chest, decided, for some reason that is not clear, that one member of the hinge should be attached to the underside of the lid inside the box. What new or useful purpose this serves, I cannot see. At any rate, had the upper member of the hinge been attached to the overlapping portion of the lid beyond the outer wall of the chest, there might have been danger of anticipation by the Heal patent, supra, or by others. Having decided, at all events, that the upper plate member of the hinge should be within the outer surface of the chest wall (whether this was useful or not), Weber was faced with the difficulty that deposits might be formed upon the metal by the cedar oil fumes from inside the chest. To overcome this, he restricted the position of the plate to a line between the inner surface of the side wall of the chest and a parallel line in a direction away from the inside of the chest—and countersunk the member within the material of the lid.

I cannot but come to the conclusion that no inventive skill was here displayed. It seems to me that any ordinary mechanic "skilled in the art", as the phrase goes,

faced with the same problem, would very rapidly have come to the same or a similar conclusion. I am quite aware of principles that have become almost proverbial in this type of case—that knowledge after the event is easy, and that problems once solved present no difficulties: But on the other hand, these aphorisms do not mean that every trivial deviation from what is known in the art is invention.

Whatever there is different in Weber's structure from that which preceded it, seems to me merely to fall within the class of "slight advances" described in the illuminating text of Mr. Justice Bradley's opinion in Atlantic Works v. Brady, 107 U.S. 192, 199, 2 S.Ct. 225, 231, 27 L.Ed. 438, 440: "The process of development in manufactures creates a constant demand for new appliances, which the skill of ordinary head-workmen and engineers is generally adequate to devise, and which, indeed, are the natural and proper outgrowth of such development. Each step forward prepares the way for the next, and each is usually taken by spontaneous trials and attempts in a hundred different places. To grant a single party a monopoly of every slight advance made, except where the exercise of invention somewhat above ordinary mechanical or engineering skill is distinctly shown, is unjust in principle and injurious in its consequences. The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the art. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accountings for profits made in good faith."

Weber was not the one that solved the difficulty of supplying a cedar chest with a pivoted hinge having a stop device or of keeping the hinges immune (by reason of their location) from the cedar chest fumes. He accomplished the result in known ways. What difference or differences his description or claim displayed, do not rise to the dignity of invention. They impress me as being entirely within the ordinary compass of the routineer. Weber combined old elements, but not in a way to produce, in the legal sense, a new or useful result. It is quite true that combinations of old elements may result in patentable inventions if there is a new or useful result; but such is not the case here. There is no evidence of a useful result, such as might be afforded by showing that the patent was responsible for a substantial advance in the art, and was received by the trade as such: Line Material Co. v. Brady Electric Mfg. Co., 2 Cir., 7 F.2d 48. There is no evidence that licenses were sought from the patentee in this case: or that the patent was acclaimed: or that it came into universal or even wide use. In other words, there does not seem to have been any appreciable advance in the art. Subjected to this test, the patent fails to meet it upon the score of invention. The fact that the plaintiff did an aggregate business of $3,500,000 in cedar chests in the past five years has no significance, it not being shown that this comparatively large gross business was due to the patent, or to its ingenuity, novelty or inventiveness.

"The prompt and general adoption of the improvement, with increased productivity of the machines to which it was applied, is strong evidence of its novelty and usefulness (Eibel Process Co. v. Minnesota, etc., Paper Co., 261 U.S. 45 [43 S.Ct. 322] 67 L. Ed. 523), but only when one is in doubt, can advance made in the art be thrown in the scale to support invention. (DeForest Radio Co. v. General Electric Co., 283 U.S. 664, 685 [51 S.Ct. 563] 75 L.Ed. 1339)". Deller's Walker on Patents, Volume 1, page 122.

As already indicated, none of the factors mentioned in the excerpt just quoted from Walker as resolving a doubt in favor of invention, appear in the evidence in the instant case.

The pivot, the stop, and the partial housing of the hinge in Weber's patent are all old elements, and the patent itself appears to me clearly to be nothing more than an

aggregation. Again, no precise formula is available: Marvel Equipment Co. v. Merit Oil Equipment Co., D.C., 29 F.2d 308. The effect of the lack of a new and useful result (as is the case here) is discussed in Hartman Furniture & Carpet Co. v. Banning, 7 Cir., 59 F.2d 129, 131, where the court said:

"The differences between aggregation and patentable combination have been defined times without number [citing cases]. A few tests are decisive. A new combination of elements, if it produces new and useful results, may be patentable, although all of the elements of the combination were old and in common use before the new combination was conceived. In other words, a new combination may consist of an association of elements one or more of which are new, or it may consist of an association of elements all of which are old but arranged in a new or novel manner. The discovery may be (not always) patentable. The result, however, to a certain extent supplies the test by which the new combination is to be measured. To be patentable, the new combination must produce a result which is the production of the combination and not a mere aggregation of several results, each the complete product of one of the combined elements. The combined results of various elements of a combination are not necessarily novel nor old results obtained in a new manner. Such combined results may be the mere aggregate of several results each of which is independent of and in no way affects the other.

"Bringing old devices into juxtaposition and allowing each to work out its own effect without the production of something novel is not invention. Bringing together several old devices without producing a new and useful result, which is the joint product of the elements of the combination and something more than the aggregation of the old results, is not invention.

"While inventions do not cover results, the latter must be studied to ascertain whether they are the product of a patentable combination or of a mere aggregation of separate, dissociated elements. A combination to be patentable must produce a different force or effect—a new or a better result—and it, the new result, must be the product of the coacting influences of the various elements. There must be a new or improved result produced by their union."

And it was said in Grinnell Washing Mach. Co. v. E. E. Johnson Co., 247 U.S. 426, 432, 38 S.Ct. 547, 549, 62 L.Ed. 1196, 1199: "Generally speaking, a combination of old elements in order to be patentable must produce by their joint action a novel and useful result, or an old result in a more advantageous way. To arrive at the distinctions between combinations and aggregations definite reference must be had to the decisions of this court."

A good illustration in a negative way is afforded by the Eibel Case, 261 U.S. 45, 56, 43 S.Ct. 322, 326, 67 L.Ed. 523, 529, where the court said: "The fact that the Eibel pitch has thus been generally adopted in the paper-making business, and that the daily product in paper making has thus been increased at least 20 per cent. over that which had been achieved before Eibel, is very weighty evidence to sustain the presumption from his patent that what he discovered and invented was new and useful."

As I have already indicated, there was no such general adoption in the instant case as to afford an analogy between it and the Eibel case; on the other hand, there was no evidence whatever of an increase in production in cedar chests following Weber's patent, or of any increase because of it.

I see no new combination of elements producing a new and useful result in Weber's patent—nothing more than an aggregation of old elements, not producing a new and useful result.

I am quite aware that the grant of a patent by the Patent Office carries a presumption of validity: Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983. But I need hardly say that the presumption is not conclusive—that much is evidenced by the innumerable court decisions declaring patents invalid. The fact that many of the prior patents, or all the relevant ones, were cited before the Patent Examiner, may strengthen the presumption, but does not supply want of conclusiveness.

Weber testified that he did not know the prior art while working at his patent, but his ignorance does not aid him in his effort to establish its validity; he is presumed by the law to "know the prior art": See Deller's Walker, Vol. 1, p. 117, and cases cited therein.

I, therefore, conclude that the plaintiff's patent, Number 1,998,599 to Weber, issued April 23, 1935, is invalid because it lacks invention; it is anticipated by prior

patents, and amounts merely to an aggregation of old elements not producing a new and useful result.

The determination of this question makes it unnecessary to consider the matter of alleged infringement. Let requests for findings of fact and conclusions of law be submitted; also a form of decree in favor of the defendant upon which judgment for the defendant may be entered.